[Cite as *Taylor v. Taylor-Wilson Dev. Co., Inc.*, 2013-Ohio-1954.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY

| | | |
|---|---|---|
| MICHAEL E. TAYLOR, | : | CASE NO. CA2012-08-026 |
| Plaintiff-Appellee, | : | |
| | : | O P I N I O N<br>5/13/2013 |
| - vs - | : | |
| | : | |
| TAYLOR-WILSON DEVELOPMENT<br>CO., INC., | : | |
| | : | |
| Defendant-Appellant. | : | |
| | : | |

CIVIL APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
Case No. 11CVH00341

Stephen A. Moyer, 9 East Kossuth Street, Columbus, Ohio 43206, for plaintiff-appellee

Ray A. Cox, 265 Regency Ridge Drive, Dayton, Ohio 45459, for defendant-appellant

**M. POWELL, J.**

{¶ 1} Defendant-appellant, Taylor-Wilson Development Company, Inc., appeals from the decision of the Fayette County Common Pleas Court granting summary judgment to plaintiff-appellee, Michael E. Taylor, on his action seeking enforcement of a promissory note issued to him by the company. For the reasons that follow, we affirm the judgment of the trial court.

{¶ 2} In 1993, Taylor and his wife, Bonnie Taylor (Bonnie), along with their friends,

Jim Wilson (Wilson) and his wife, Connie J. Wilson (C.J.), created Taylor-Wilson Development Company, Inc. (T-WDCI), a residential real estate development company. Taylor, Bonnie, Wilson and C.J. were each 25 percent shareholders of T-WDCI. Taylor was the company's president and handled its day-to-day operations, while Wilson handled its finances.

{¶ 3} In December 2003, Taylor was indicted for various sex crimes involving minors. Sometime in early or mid-2004, T-WDCI's shareholders met with the company's corporate counsel, William Junk (Attorney Junk), who was also Taylor's personal attorney. At that time, Taylor advised the other shareholders that a civil suit arising from the charges against him was imminent and that he had retained Attorney David Whittaker (Attorney Whittaker) to represent him in the impending civil action. Taylor told the shareholders that Attorney Whittaker advised him that, in order to eliminate any threat to T-WDCI or the possibility of the other shareholders becoming involved in the civil action, it would be in the best interests of the company and its shareholders for Taylor to divest himself of his stock in T-WDCI and eliminate his involvement with the corporation. The shareholders agreed that Taylor would sell back his shares to T-WDCI.

{¶ 4} In November 2004, Taylor pled guilty to three counts of sexually abusing children, and in December 2004, he was sentenced to nine years in prison. On the day Taylor was sent to prison (December 16, 2004), he signed a "Stock Purchase Agreement," prepared by Attorney Junk. In May 2005, T-WDCI, through its remaining shareholders, Bonnie, Wilson and C.J., signed the stock purchase agreement and a promissory note in favor of Taylor, and Taylor executed an "Assignment of Stock" in favor of T-WDCI. The stock purchase agreement, promissory note and assignment of stock were back-dated to January 1, 2005.

{¶ 5} The promissory note provided that T-WDCI owed Taylor $93,590.75 for his

shares in T-WDCI, with simple interest at five percent per annum. Taylor was to be paid the accrued interest every six months, commencing on July 1, 2005. The principal was to be paid in full upon corporate dissolution but not later than January 1, 2015. The promissory note also had an acceleration clause which provided that, in the event of nonpayment of any installment of interest due under the agreement, the entire balance of principal then remaining unpaid, along with any accrued interest thereon, shall at once become due and payable at Taylor's option, without notice or demand.

{¶ 6} In July 2005, T-WDCI began making interest payments on the note every six months and continued making such payments to Taylor until July 2010. On February 9, 2009, Bonnie, Wilson and C.J. sent Taylor a letter, asking him to forgive the balance due on the promissory note because of the state of the economy and other circumstances beyond their control. Taylor refused their request. When T-WDCI failed to make an interest payment on July 1, 2011, Taylor demanded payment under the promissory note's acceleration clause. When T-WDCI refused payment, Taylor filed suit against the company in the Fayette County Common Pleas Court, seeking enforcement of the promissory note.

{¶ 7} Taylor moved for summary judgment on his claim. T-WDCI, in its memorandum in opposition, argued it should not be found liable on the promissory note, because, among other things, Taylor had fraudulently induced T-WDCI's remaining shareholders to sign the stock purchase agreement and promissory note as a result of Taylor's false claims of innocence on the child molestation charges. In support of its argument, T-WDCI presented affidavits from Bonnie, Wilson and C.J. who averred that (1) Taylor's decision to eliminate his involvement with T-WDCI by divesting himself of his shares of stock in the company was meant to be a "temporary fix" that was to last only "until the whole thing blew over"; (2) Taylor had represented to them that the temporary divestment was not "a money maker for him" and that he did not expect to be paid on the promissory

- 3 -

note; and (3) Taylor had declared, on numerous occasions, that he was innocent of all charges filed against him.

{¶ 8} The trial court granted summary judgment to Taylor on his breach-of-contract claim on the promissory note after determining that (1) the parties' stock purchase agreement, promissory note and assignment of stock "are clear and unambiguous"; (2) the parol evidence rule precluded T-WDCI from presenting any evidence of an alleged oral agreement between the parties that Taylor would not seek payment on the promissory note; (3) "[n]o exception to the parol evidence rule exists [that] would afford any relief to [T-WDCI] under the facts of this case"; and (4) "[a]ssuming such an exception exists, [T-WDCI's] action to void the [stock purchase and assignment of stock] agreements and promissory note are [sic] barred by the applicable statute of limitations." The trial court also found that the "protestations of innocence" that Taylor allegedly made to T-WDCI"are immaterial." Consequently, the trial court awarded summary judgment in favor of Taylor and against T-WDCI in the principal amount of $93,590.75 plus interest of $2,339.77 as of July 1, 2011.

{¶ 9} T-WDCI now appeals, assigning the following as error:

{¶ 10} "THE TRIAL COURT ERRED BY GRANTING APPELLEE'S (TAYLOR) MOTION FOR SUMMARY JUDGMENT." [Sic.]

{¶ 11} T-WDCI argues the trial court erred in granting summary judgment in favor of Taylor because (1) there are a number of genuine issues of material fact remaining to be litigated, which make the award of summary judgment to Taylor inappropriate; (2) the parol evidence rule is inapplicable to bar the evidence T-WDCI submitted to prove its affirmative defenses of fraudulent inducement and duress; and (3) T-WDCI's affirmative defenses of fraudulent inducement and duress are not barred by the statute of limitations applicable to those claims.

{¶ 12} As we have recently stated in *Wells Fargo v. Smith*, 12th Dist. No. CA2012-04-006, 2013-Ohio-855, ¶ 25:

> Summary judgment is appropriate when there are no genuine issues of material fact to be litigated, the moving party is entitled to judgment as a matter of law, reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party. Civ.R. 56(C); *Williams v. McFarland Properties, L.L.C.,* 177 Ohio App.3d 490, 2008-Ohio-3594, ¶ 7 (12th Dist.). To prevail on a motion for summary judgment, the moving party must be able to point to evidentiary materials that show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The nonmoving party must then present evidence that some issue of material fact remains to be resolved; it may not rest on the mere allegations or denials in its pleadings. *Id.* All evidence submitted in connection with a motion for summary judgment must be construed most strongly in favor of the party against whom the motion is made. *Morris v. First Natl. Bank & Trust Co.,* 21 Ohio St.2d 25, 28 (1970).

{¶ 13} Initially, we agree with T-WDCI that the trial court erred when it found that the company's "action to void the [the stock purchase and assignment of stock] agreements and promissory note are [sic] barred by the applicable statute of limitations[,]" because T-WDCI used its allegations of fraudulent inducement and duress *defensively* rather than *offensively*, and therefore, the statute of limitations that the trial court found to be applicable in this case, i.e., R.C. 2305.09, is inapplicable to this case. *Summers v. Connolly*, 159 Ohio St. 396, 404 (1953); *In re Butler's Estate*, 137 Ohio St. 96, paragraph five of the syllabus (1940). However, the error was clearly harmless under Civ.R. 61 since the trial court's erroneous finding that T-WDCI's claims for fraudulent inducement and duress are barred by the statute of limitations served only as an alternative basis for its decision to grant summary judgment to Taylor.

{¶ 14} We also note, as a threshold matter, that T-WDCI has raised two, primary defenses to Taylor's breach-of-contract claim regarding the promissory note: (1) Taylor, by

his false protestations of innocence regarding the child molestation charges against him, fraudulently induced T-WDCI, through its remaining shareholders, to execute the promissory note in his favor; and (2) the parties' contract, which is comprised of their stock purchase agreement, promissory note and assignment of stock, was not intended or understood by either party to be a binding contract. In furtherance of these two arguments, T-WDCI sets forth nine issues of material fact that, T-WDCI alleges, should have precluded the trial court from granting summary judgment to Taylor on his breach-of-contract claim on the promissory note:

> 1. Did Taylor represent to [T-WDCI] through its shareholders that he (Taylor) was innocent?
>
> 2. Did Taylor represent to [T-WDCI] through its shareholders that he (Taylor) was only selling his shares as a "temporary fix" pending victims' claims?
>
> 3. Did Taylor represent or imply to [T-WDCI] through its shareholders that he (Taylor) was not to be repaid?
>
> 4. Were those representations material?
>
> 5. Did [T-WDCI] through its shareholders reasonable [sic] rely upon said representations?
>
> 6. Were the representations made by Taylor false?
>
> 7. Did Taylor acknowledge that said representations were false?
>
> 8. Was shareholder Bonnie's (wife of Taylor) signature, to the promissory note obtained by duress?
>
> 9. Do the facts of this case fall within the absolute defenses [of fraudulent inducement and duress in] * * *1305.35 (A)(1)(b)(c) O.R.C.?

{¶ 15} As to T-WDCI's "duress" defense in items 8 and 9, which is based on Bonnie's claims that Taylor "was always verbally abusive of me and required me to sign all documents he gave me[,]" we agree with Taylor that T-WDCI waived this defense by failing to raise it in its answer to Taylor's amended complaint, as required by Civ.R. 8(C). Civ.R. 8(C) provides

that duress is an affirmative defense. Therefore, under that rule, T-WDCI was required to raise its duress defense in its answer to Taylor's amended complaint. T-WDCI acknowledged during oral arguments that it failed to do so, and therefore, it has waived this defense.

{¶ 16} Nevertheless, T-WDCI argues the trial court erred in finding that the evidence it submitted to prove the remaining items of alleged material fact was inadmissible under the parol evidence rule. T-WDCI asserts that the parol evidence rule does not bar parol or extrinsic evidence, such as the affidavit and deposition testimony of Bonnie, Wilson and C.J., from being admitted to prove a claim of fraudulent inducement. T-WDCI also asserts that because the affidavit and deposition testimony of Bonnie, Wilson and C.J. was admissible, a genuine issue of material fact exists as to whether the parties' contract, which is comprised of their stock purchase agreement, promissory note and assignment of stock, was intended or understood by either party to be a binding contract, *or* stated another way, whether the parties' contract was the complete and accurate integration of their agreement. We find these arguments unpersuasive.

{¶ 17} In *Galmish v. Cicchini*, 90 Ohio St.3d 22, 27, 28 (2000), the court discussed the parol evidence rule, as follows:

> The parol evidence rule states that "absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements." 11 Williston on Contracts (4 Ed.1999) 569-570, Section 33:4. Despite its name, the parol evidence rule is not a rule of evidence, nor is it a rule of interpretation or construction. *Charles A. Burton, Inc. v. Durkee* (1952), 158 Ohio St. 313, 324, 49 O.O. 174, 179, 109 N.E.2d 265, 270. "The parol evidence rule is a rule of substantive law which, when applicable, defines the limits of a contract." *Id.*, paragraph one of the syllabus.
>
> As summarized by the Supreme Court of California in *In re Gaines' Estate* (1940), 15 Cal.2d 255, 264-265, 100 P.2d 1055,

1060:

> The parol evidence rule, as * * * applied to contracts[,] is simply that as a matter of substantive law, a certain act, the act of embodying the complete terms of an agreement in a writing (the "integration"), becomes the contract of the parties. The point then is, not how the agreement is to be proved, because as a matter of law the writing is the agreement. Extrinsic evidence is excluded because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself. The rule comes into operation when there is a single and final memorial of the understanding of the parties. When that takes place, prior and contemporaneous negotiations, oral or written, are excluded; or, as it is sometimes said, the written memorial supersedes these prior or contemporaneous negotiations.
>
> The principal purpose of the parol evidence rule is to protect the integrity of written contracts. *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St.3d 433, 440, 662 N.E.2d 1074, 1080. By prohibiting evidence of parol agreements, the rule seeks to ensure the stability, predictability, and enforceability of finalized written instruments. "It reflects and implements the legal preference, if not the talismanic legal primacy, historically given to writings. It effectuates a presumption that a subsequent written contract is of a higher nature than earlier statements, negotiations, or oral agreements by deeming those earlier expressions to be merged into or superseded by the written document." (Footnotes omitted.) 11 Williston on Contracts, *supra*, at 541-548, Section 33:1.

{¶ 18} In *Bellman v. Am. Internat'l Group*, 113 Ohio St.3d 323, 2007-Ohio-2071, ¶ 11, the court stated, "[a] contract that appears to be a complete and unambiguous statement of the parties' contractual intent is presumed to be an integrated writing." Here, the parties' contract "appears to be a complete and unambiguous statement of the parties' contractual intent[,]" and therefore the parties' contract "is presumed to be an integrated writing." *Id.*

{¶ 19} The *Galmish* court discussed the "fraudulent inducement" exception to the parol evidence rule, as follows:

> [T]he parol evidence rule does not prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement. *Drew v. Christopher Constr. Co., Inc.* (1942), 140 Ohio St. 1, 23 O.O. 185, 41 N.E.2d 1018, paragraph

- 8 -

two of the syllabus.  See, also, *Union Mut. Ins. Co. of Maine v. Wilkinson* (1871), 80 U.S. (13 Wall.) 222, 231-232, 20 L.Ed. 617, 622.  As explained in Annotation, Parol-Evidence Rule; Right to Show Fraud in Inducement or Execution of Written Contract (1928), 56 A.L.R. 13, 34-36:

> The principle which prohibits the application of the parol-evidence rule in cases of fraud inducing the execution of a written contract * * * has been regarded as being as important and as resting on as sound a policy as the parol-evidence rule itself.  It has been said that if the courts were to hold, in an action on a written contract, that parol evidence should not be received as to false representations of fact made by the plaintiff, which induced the defendant to execute the contract, they would in effect hold that the maxim that fraud vitiates every transaction is no longer the rule; and such a principle would in a short time break down every barrier which the law has erected against fraudulent dealing.

*Glamish* at 28.

{¶ 20}  The *Galmish* court then discussed the circumstances in which the fraudulent

inducement exception to the parol evidence rule does **not** apply:

> [T]he parol evidence rule may not be avoided "by a fraudulent inducement claim which alleges that the inducement to sign the writing was a promise, the terms of which are directly contradicted by the signed writing.  Accordingly, an oral agreement cannot be enforced in preference to a signed writing which pertains to exactly the same subject matter, yet has different terms." *Marion Prod. Credit Assn. v. Cochran* (1988), 40 Ohio St.3d 265, 533 N.E.2d 325, paragraph three of the syllabus. See, also, *Ed Schory & Sons, Inc.*, supra, 75 Ohio St.3d at 440, 662 N.E.2d at 1080.  [Footnote omitted.]  In other words, "[t]he Parol Evidence Rule will not exclude evidence of fraud which induced the written contract.  But, a fraudulent inducement case is not made out simply by alleging that a statement or agreement made prior to the contract is different from that which now appears in the written contract.  Quite to the contrary, attempts to prove such contradictory assertions is exactly what the Parol Evidence Rule was designed to prohibit." Shanker, Judicial Misuses of the Word Fraud to Defeat the Parol Evidence Rule and the Statute of Frauds (With Some Cheers and Jeers for the Ohio Supreme Court) (1989), 23 Akron L.Rev. 1, 7.
>
> The same concept-that the proffered evidence of fraud must show more than a mere variation between the terms of the

- 9 -

written and parol agreement-applies to allegations of promissory fraud * * *. Thus, "[t]he rule excluding parol evidence of collateral promises to vary a written contract does not apply where such contract is induced by promises fraudulently made, with no intention of keeping them * * *." 37 American Jurisprudence 2d, supra, at 623, Section 452. *However, the parol evidence rule does apply "to such promissory fraud if the evidence in question is offered to show a promise which contradicts an integrated written agreement. Unless the false promise is either independent of or consistent with the written instrument, evidence thereof is inadmissible." Alling v. Universal Mfg. Corp.* (1992), 5 Cal.App.4th 1412, 1436, 7 Cal.Rptr.2d 718, 734.

*Galmish* at 29-30 . (Emphasis added.)

{¶ 21} Under *Galmish*, the parol evidence rule could not be avoided by a claim that T-WDCI, through its remaining shareholders, Bonnie, Wilson and C.J., was fraudulently induced into signing the three agreements that comprise the parties' contract by Taylor's promises that the contract was meant to be only "temporary," was to last only "until the whole thing blew over," and that he did not expect to be paid on the promissory note. As stated in *Galmish* at 30, quoting *Alling*, 5 Cal.App.4th 1412, 1436, "the parol evidence rule *does* apply 'to such promissory fraud if the evidence in question is offered to show a promise which contradicts an integrated written agreement. Unless the false promise is either independent of or consistent with the written instrument, evidence thereof is inadmissible.'" (Emphasis added.)

{¶ 22} Under the doctrine of "collateral contract" and the related "collateral agreement" exception to the parol evidence rule, "[e]vidence of a collateral oral agreement is admissible only if it does not conflict with the written agreement and covers a subject matter distinct from, though closely related to, the express subject matter of the agreement and is not included in the agreement." *Takis, L.L.C. v. C.D. Morelock Properties, Inc.*, 180 Ohio App.3d 243, 2008-Ohio-6676 (10th Dist.2008), ¶ 26.

{¶ 23} Here, Taylor's alleged promises to T-WDCI, made to its remaining

shareholders, Bonnie, Wilson and C.J., that (1) the parties' agreement requiring him to divest himself of his shares of stock in T-WDCI was meant to be a "temporary fix" that was to last only "until the whole thing blew over"; (2) the temporary divestment was not "a money maker for him"; and (3) he did not expect to be paid on the promissory note, are contradicted by, and entirely inconsistent with, the terms of the parties' written promissory note, and therefore his alleged, oral promise cannot fall within the "collateral agreement" exception to the parol evidence rule. *Id.*

{¶ 24} T-WDCI argues it was fraudulently induced into signing the contract, including the promissory note, by Taylor's false protestations of innocence on the molestation charges against him. T-WDCI also argues the trial court erred by finding that Taylor's protestations of innocence were "immaterial." We disagree with both arguments.

{¶ 25} In granting summary judgment to Taylor, the trial court failed to offer a clear explanation as to why it found Taylor's protestations of innocence to be immaterial. However, the evidence presented in the summary judgment proceedings shows why the trial court arrived at this conclusion.

{¶ 26} The parties entered into their contract in order to protect the assets of T-WDCI and its then four, co-equal shareholders, Taylor, Bonnie, Wilson and C.J. By the time T-WDCI repurchased Taylor's 25 percent shares of stock, Taylor already had pled guilty to several child molestation charges and had been convicted of those charges and sent to prison.

{¶ 27} Bonnie, Wilson and C.J. allege in their affidavit and deposition testimony that at the time they signed the stock purchase agreement and promissory note, they still believed Taylor's continuing protestations of innocence on the child molestation charges against him. However, irrespective of their subjective beliefs on Taylor's guilt or innocence on the charges, it was apparent to Bonnie, Wilson and C.J. that they needed Taylor to divest himself of his

- 11 -

shares in T-WDCI, in order to protect the company and its shareholders from Taylor's creditors, i.e., his child molestation victims. Therefore, it is apparent that T-WDCI and its remaining shareholders did not sign the underlying agreements that made up the contract due to their subjective belief in Taylor's innocence, but rather, to protect T-WDCI's assets, as well as their own.

{¶ 28} T-WDCI also argues the trial court erred in not finding the affidavit and deposition testimony of Bonnie, Wilson and C.J. to be admissible under the exception to the parol evidence rule that allows parol or extrinsic evidence to be admitted to show that the parties to a document or writing did not intend or understand for the document or writing to be a binding contract between them, *or* stated another way, that allows parol or extrinsic evidence to be admitted to show whether the parties' document or writing was a complete and accurate integration of the parties' contract. In support of this argument, T-WDCI relies on *Natl. City Bank, Akron v. Donaldson*, 95 Ohio App.3d 241, 245-246 (9th Dist.1994), which states:

> A document that was agreed to by the parties as a "complete and accurate integration of [a] contract" is a prerequisite to application of the parol evidence rule. Presentation of a document that, on its face, appears to be a "complete and accurate integration of [a] contract" will often be sufficient to satisfy this prerequisite because the parties will acknowledge that they intended the document to serve that purpose. * * *
>
> * * *
>
> *A different situation is presented, however, when one of the parties to what appears on its face to be a "complete and accurate integration of [a] contract" argues that the parties agreed that the document would not be an expression of an agreement between them. In that situation, the parol evidence rule has no application until the initial issue of whether the parties intended the proffered document to be an expression of their agreement has been resolved. Any otherwise admissible evidence is properly considered by a court in determining whether a proffered document was intended by the parties to be a "complete and accurate integration of [a] contract" between*

*them*:

"That a writing was or was not adopted as a completely integrated agreement may be proved by any relevant evidence. A document in the form of a written contract, signed by both parties and apparently complete on its face, may be decisive of the issue in the absence of credible contrary evidence.  But a writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties."  2 Restatement of the Law 2d, Contracts (1981), Section 210, Comment b; 2 Farnsworth on Contracts (2 Ed.1990), Section 7.4 at 211-213; 3 Corbin on Contracts (1960) 360, Section 573.  As explained by the United States Court of Appeals for the Second Circuit, parties may execute a document that, on its face, appears to be a "complete and accurate integration of [a] contract," for reasons other than a desire to make an enforceable agreement:

"It is well settled that whatever the formal documentary evidence, the parties to a legal transaction may always show that they understand a purported contract not to bind them; it may, for example, be a joke, or a disguise to deceive others.  * * * It is no objection that such an understanding contradicts the writing; a writing is conclusive only so far as the parties intend it to be the authoritative memorial of the transaction.  Whatever the presumptions, their actual understanding may also be shown except in so far as expressly or implicitly they have agreed that the writing alone shall control.  While it is true that an intent to make a contract is not necessary to the creation of a contract and that parties who exchange promises will find themselves bound, whatever they may have thought, nevertheless they will not be bound if they agree that their words, however coercive in form, shall not bind them." (Citations omitted.)  *In re H. Hicks & Son, Inc.* (C.A. 2, 1936), 82 F.2d 277, 279; 3 Corbin, Corbin on Contracts, supra, at 393-396, Section 577.

(Emphasis added.)

{¶ 29} Relying on *Donaldson*, T-WDCI argues the parties agreed that their contract, which included the parties' stock purchase agreement, promissory note and assignment of stock, was *not* meant to be an expression of the parties' complete and accurate integration of their agreement.  In support of this argument, T-WDCI, relying on the affidavit and deposition testimony of Bonnie, Wilson and C.J., asserts that Taylor informed T-WDCI, through Bonnie, Wilson and C.J., that the agreement was meant to be "temporary" and was to last only "until

the whole thing blew over," and that he did not expect to be paid on the promissory note. T-WDCI contends that, under *Donaldson*, the parol evidence rule has no application in this case until resolution of the issue of whether the parties intended their contract, including the promissory note, to be an expression of the parties' complete and accurate integration of their agreement. *Id.* at 245-246. T-WDCI also contends that any otherwise admissible evidence, including the affidavit and deposition testimony of Bonnie, Wilson and C.J., should have been considered by the trial court in determining whether the parties' contract was intended by the parties to be the complete and accurate integration of the parties' agreement. *Id.* at 246.

{¶ 30} T-WDCI's argument is not without some force. As noted in *Donaldson*, "'a writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties.'" *Id.* at 246, quoting, among other authorities, 2 Restatement of the Law 2d, Contracts (1981), Section 210, Comment *b*. Moreover, this court and other appellate districts in this state have cited *Donaldson* with approval. *See, e.g., Mazzaferri v. Weller Roofing, Inc.*, 12th Dist. No. CA96-10-197, 1997 WL 700066, * 2 (Nov. 10, 1997), and *Erd v. Sparrow*, 2nd Dist. No. 98-CA-43, 1999 WL 55684, * 4 (Feb. 5, 1999). However, we find *Donaldson* to be distinguishable from this case.

{¶ 31} In *Donaldson*, National City Bank sued Juanita Donaldson for money due on a promissory note that she and her son had signed to enable her son to purchase a car. *Id.* at 243-244. Donaldson's son eventually defaulted on the note, the car was repossessed and sold, and National City Bank sued Donaldson for the $5,655.29 deficiency on the note. *Id.* Donaldson opposed National City Bank's motion for summary judgment with her affidavit in which she acknowledged that she had signed the note, but insisted she should not be held liable on it. Donaldson testified in her affidavit that she told the car salesman at the dealership from which her son had bought the car that she could not afford to make monthly

- 14 -

payments because Social Security was her only source of income. Donaldson testified the salesman had assured her that he would "arrange things" so that she would not have to pay anything on the note. *Id.* at 244. Donaldson also alleged that the car salesman visited her at her church for the purpose of obtaining her signature on the note. *Id.*

{¶ 32} The trial court found that Donaldson's affidavit was inadmissible under the parol evidence rule and granted summary judgment to National City Bank on the promissory note. Donaldson appealed the trial court's decision to the Ninth District Court of Appeals, which reversed the trial court. In support of its decision, the *Donaldson* court stated:

> Donaldson submitted evidence, in the form of her affidavit * * * that the [promissory note she had signed] was not what it appeared to be. She contended that she had not signed the document as a "complete and accurate integration of [a] contract" by which she agreed to pay her son's debt, but rather signed it only after she was assured she would not have to pay his debt and that her signature was only necessary because she had "good credit." In order to conclude whether the parol evidence rule was applicable in this case, the trial court was required to determine, based upon "any relevant evidence," whether the parties intended the document signed by Donaldson to be a "complete and accurate integration of [a] contract" between them. According to Donaldson's affidavit, she and the salesman agreed, prior to her signing the document at issue, that the document would not be an enforceable contract. In view of that affidavit, National City was not entitled to summary judgment against Donaldson.

*Id.* at 246-247.

{¶ 33} The factual circumstances of this case are markedly different from the ones present in *Donaldson.* Of critical importance is that the facts of this case show that T-WDCI fulfilled its obligations under its contract with Taylor for five years, from July 2005 until July 2010, including its obligation to make interest payments to Taylor on the promissory note every six months. During that five-year period, T-WDCI and its remaining shareholders behaved in every manner as if the parties' stock purchase agreement, promissory note and assignment of stock were, in fact, the parties' contract.

{¶ 34} Shortly after the real estate market collapsed in 2008, Bonnie, Wilson and C.J., sent Taylor a letter on February 9, 2009, asking him to forgive the note and release them "from any further monetary obligation to you." Bonnie, Wilson and C.J. did not include any language in the letter reminding Taylor of his alleged promises that the parties' contract was temporary and was to last only "until the whole thing blew over," and that Taylor was not expecting payment on the promissory note.

{¶ 35} This court is mindful that Civ.R. 56(C) requires us to examine the evidence in a light most favorable to the nonmoving party in summary judgment proceedings. We are also mindful that it is not the place for either a trial court or an appellate court to weigh the evidence presented during the summary judgment proceedings, or to accept one party's interpretation of that evidence over that of another party. *Lennon v. Neil*, 139 Ohio App.3d 437, 442 (11th Dist.2000).

{¶ 36} While it is generally inappropriate for a trial court or appellate court to consider either the *weight* of the evidence or the *credibility* of witnesses who provide affidavit or deposition testimony in summary judgment proceedings, *Halley v. Grant Trucking, Inc.*, 67 Ohio App.3d 357, 364 (4th Dist.1990), there are instances in which a court will have to consider the *sufficiency* of the evidence, at least, "to some degree."

{¶ 37} When the moving party in a summary judgment proceeding has met its initial burden of showing that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law, the nonmoving party must then present evidence that some issue of material fact remains to be resolved. *Wells Fargo*, 2013-Ohio-855 at ¶ 25, citing *Dresher*, 75 Ohio St.3d at 293. As stated in *Kassouf v. Cleveland Magazine City Magazines*, 142 Ohio App.3d 413, 420 (11th Dist.2001):

> [A] trial court must determine whether sufficient competent evidence has been presented by the party opposed to the motion [for summary judgment] on any issue for which that party bears

the burden at trial. *Shafer v. Ford Motor Co., Inc.* (Feb. 28, 1997), Trumbull App. No. 96-T-5504, unreported, at 9, 1997 WL 374310, citing *Wing* [*v. Anchor Media, Ltd. of Texas* (1991),] *supra*, 59 Ohio St.3d 108, 111, 570 N.E.2d 1095, 1099. Examination of the evidence is necessary to enable the court to determine whether the nonmoving party has met this threshold standard. *Id.* at 9.

{¶ 38} "[I]f the moving party has demonstrated that the non-moving party's claim is factually implausible, then the non-moving party must produce more persuasive evidence to support his claim." *Paul v. Uniroyal Plastics Co.*, 62 Ohio App.3d 277, 282 (6th Dist.1988), citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348 (1986). As further noted in *Paul*:

> Assessing the sufficiency of the evidence in the context of a motion for summary judgment involves a qualitative, as well as a quantitative, analysis. *Matsushita Elec. Indus. Co., Ltd., supra*, 475 U.S. at 586, 106 S.Ct. at 1355-1356, 89 L.Ed.2d at 552. Therefore in addition to considering the amount of evidence presented on an issue, the court must consider whether the evidence makes the party's claim plausible.

{¶ 39} In the present case, we conclude that no reasonable jury could have accepted as true T-WDCI's contention that Taylor agreed not to seek payment on the promissory note, given T-WDCI's conduct in paying Taylor interest on the note every six months for a period of five years. Nor could any reasonable jury have found in favor of T-WDCI on its defenses to Taylor's breach-of-contract claim on the parties' promissory note, including its fraudulent inducement claim or its claim that the parties' contract was not a full and complete, integrated expression of the parties' agreement. There is an overwhelming amount of evidence that was presented during the summary judgment proceedings that leads us to this conclusion.

{¶ 40} Under T-WDCI's interpretation of the parties' contract, including the promissory note, Taylor essentially receives no benefits from the agreement. By asserting that Taylor agreed that he was not expecting to be paid and that he would not seek payment on the promissory note, even though T-WDCI paid Taylor interest on the note every six months for

five years, T-WDCI is essentially arguing that Taylor traded his corporate stock in T-WDCI for a debt from it, which T-WDCI insists he then promised he would not collect. Such an argument is simply not plausible, and therefore it fails to establish the existence of a genuine issue of material fact for trial. Moreover, that implausible argument does not stand alone.

{¶ 41} If, as Bonnie, Wilson and C.J. contend, the parties' contract was merely a bogus arrangement that was designed to last only temporarily "until the whole thing blew over," then why did T-WDCI's attorneys draft legal documents memorializing the transaction and why did its accountants spend time coming up with a valuation of the company? Even more importantly, why did T-WDCI pay interest to Taylor every six months, for a five-year period from July 2005 to July 2010? Why did T-WDCI, through Bonnie, Wilson and C.J., send the February 9, 2009 letter to Taylor *asking him* to forgive the promissory note, when Taylor, allegedly, had already told them he was not expecting payment on the note? Why did the company and its remaining shareholders fail to remind Taylor of his alleged promises that the arrangement was not a "money maker" for him and was meant to be temporary and last only until "the whole thing blew over," and that Taylor had told them he was not expecting to be paid on the promissory note?

{¶ 42} Bonnie, Wilson and C.J. argue they made interest payments to Taylor under the terms of the promissory note for five years because they were concerned about his ability to survive his incarceration and they continued to believe his protestations of innocence on the child molestation charges against him until he refused their February 9, 2009 request that he forgive the promissory note and any other obligations they owed to him. However, on June 29, 2005, C.J. sent Taylor a letter while he was in prison, which states in pertinent part:

> Mike, what I want you to hear me saying is that the words, "I'm sorry" are important in bringing healing and restoration to everyone concerned. It is also important to know that the Bible says, "Repentance comes with confession." "When we confess our sins, He is faithful and just to forgive us our sins and (hear

this well), to CLEANSE us from ALLL UNRIGHTEOUNESS [*sic*]."
That means Jesus will reveal to us those ideologies, habits, grudges, etc. that are unrighteous and keep us from receiving the incredible blessings, abundant life and joy that the Lord wants us to have. *I want God's best for you, but I feel in my heart that you are not yet willing to let it all out. You have to talk with Bonnie and tell her everything so she can truly forgive and love you completely and absolutely, warts and all. Trust her and trust all of us enough to love you no matter what.*

(Emphasis added.)

{¶ 43} We also agree with the trial court's observation that the parties' contract either had to have been legitimate, *or* T-WDCI and its remaining shareholders, Bonnie, Wilson and C.J., were complicit in a scheme designed to shelter Taylor's assets from his child molestation victims.

{¶ 44} T-WDCI's allegations are unsupported by any evidence other than the self-serving affidavit and deposition testimony of its remaining shareholders, Bonnie, Wilson and C.J. Those allegations are belied by T-WDCI's actions in which it performed its obligations under the terms of its promissory note with Taylor for five years, including paying him interest every six months while he was in prison. T-WDCI and its remaining shareholders sought to be relieved of its obligations under the parties' contract when they became overly burdensome to the company as a result of the severe economic downturn in general and the collapse of the real estate market in particular, and they did not claim their contract with Taylor was invalid until Taylor turned down their request that he forgive their debt to him.

{¶ 45} The parties' contract, comprised of their stock purchase agreement, promissory note and assignment of stock, is clearly the parties' unambiguous, full and complete integrated agreement; there is no evidence supporting a plausible claim that Taylor fraudulently induced T-WDCI, through its remaining shareholders, to enter into the parties' contract; and Taylor was entitled to enforce the promissory note, which was a key component of the parties' contract. Consequently, the trial court did not err in granting summary

- 19 -

judgment to Taylor on his breach-of-contract claim on the parties' promissory note.

{¶ 46} In light of the foregoing, T-WDCI's sole assignment of error is overruled.

{¶ 47} Judgment affirmed.


HENDRICKSON, P.J. and PIPER, J., concur.